Dale M. WALLIS, D.V.M., James L. Wallis, an Hygieia Biological Laboratories, Inc., a California Corporation, Plaintiffs,

v.

CENTENNIAL INSURANCE COMPANY, INC., a New York Corporation, Atlantic Mutual Insurance Co., Inc., a New York Corporation, Defendants,

and Related Counterclaims and Third Party Complaint.

No. CIV. 08–02558 WBS AC.

United States District Court, E.D. California.

Nov. 12, 2013.

Joanna Rae Mendoza, Law Offices of Joanna R. Mendoza, Granite Bay, CA, Joel C. Baiocchi, Law Office of Joel C. Baiocchi, Dutch Flat, CA, for Plaintiffs.

David A. Evans, Gary Robert Selvin, Selvin Wraith Halman LLP, Oakland, CA, Joanna Rae Mendoza, Law Offices of Joanna R. Mendoza, Granite Bay, CA, for Defendants, and Related Counterclaims and Third Party Complaint.

## MEMORANDUM OF DECISION

WILLIAM B. SHUBB, District Judge.

Plaintiffs Dale M. Wallis, D.V.M. ("Dr. Wallis"), James L. Wallis ("Mr. Wallis"), and Hygieia Biological Laboratories, Inc. ("Hygieia") filed this suit against defendants Centennial Insurance Company, Inc. ("Centennial") and Atlantic Mutual Insurance Company ("Atlantic Mutual") arising out of defendants' alleged wrongdoing in defending Dr. Wallis under a professional liability insurance policy. Defendants subsequently filed a counterclaim against plaintiffs and a third party complaint ("TPC") against plaintiffs' attorney, Joanna Mendoza.

After conducting a nine-day bench trial, the court finds in favor of defendants on both of plaintiffs' claims. The court further finds in favor of defendants on their counterclaims against plaintiffs. Finally, the court finds in favor of third party defendant on defendants' third party complaint. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

## I. Factual and Procedural Background

### A. Factual Background

The underlying evidentiary facts are for the most part undisputed. Most of the relevant communications were in writing. The letters and emails containing those communications are in evidence, and the court incorporates them into this decision. All objections as to relevance were reserved, and the court has considered only those exhibits and that testimony which may relate to the facts and issues discussed in this decision.

Dr. Wallis is a research veterinarian who has been licensed to practice veterinary medicine in California since 1988. Mr. Wallis is the former husband of Dr. Wallis and president of Hygeia.

In 1988, Dr. Wallis purchased a professional liability insurance policy ("the Policy") through the American Veterinary Medical Association Professional Liability Insurance Trust. Dr. Wallis was issued the Policy from Centennial as a "member of the Atlantic Mutual Companies."[1] (Ex. 1.)

In 1994, Dr. Wallis filed suit in the Superior Court of California, County of Yolo, against her former employer, Poultry Health Laboratories ("PHL"), alleging causes of action for unjust enrichment, fraud, conspiracy, constructive fraud, constructive trust, and conversion. In 1999, PHL filed a cross-complaint against Dr. Wallis, Mr. Wallis, and Hygieia, alleging causes of action for declaratory relief, rescission, intentional interference with contractual advantage, fraud, misappropriation of trade secrets, conversion, breach of fiduciary duty, unfair competition, and conspiracy.

On May 26, 1999, Centennial agreed to provide a defense of the PHL cross-complaint subject to a reservation of rights. (Ex. 15.) Because defendants provided the defense under a reservation of rights, plaintiffs retained independent counsel of their own choosing ("*Cumis* counsel") pursuant to California Civil Code section 2860. Plaintiffs selected third party defendant Mendoza, then at Graham & James LLP, as *Cumis* counsel. (Ex. 14.) Mendoza had previously been representing plaintiffs in their underlying suit against PHL. (*Id.*) Subsequently, Mendoza joined the firm Livingston & Mattesich. (Ex. 16.)

Plaintiffs successfully moved to bifurcate the trial on the complaint and the cross-complaint. In 2000, after trial on the complaint, a jury awarded Dr. Wallis more than $2 million in compensatory damages and $500,000.00 in punitive damages. (Ex. NNN.) The trial court also awarded Dr. Wallis a constructive trust against PHL for more than one million dollars. (*Id.*) The court, however, did not enter final judgment because the cross-complaint was still pending. (*Id.*)

The first billing issues began in late 2002. On December 23, 2002, Mendoza sent an email to Tanya Turner, a claim specialist at Atlantic Companies, informing Turner that the insurance company was past due on about $90,000.00 in legal fees, with $113,000.00 owed in total to Mendoza's firm. (Ex. 26.) Turner responded the next day that she would "handle the invoices" but informed Mendoza that Mendoza had failed to provide timely reporting on the case and that the "bills are consistently high." (*Id.*) Mendoza testified that this was the first instance she had heard of a requirement to send status reports to

---

**1.** For the purposes of this decision, the court makes no distinction between Centennial and Atlantic Mutual.

the insurer, and she did not recall when she received payment on the invoice.

In early 2003, the parties reached a tentative agreement to settle both plaintiffs' complaint as well as PHL's cross-complaint. (Ex. 29.) Defendants did not agree to the settlement, contending that one of its provisions requiring defendants to pay Dr. Wallis $1 million directly was not covered under the Policy. (Ex. 44.)

From July 2000 to November 2003, defendants paid a total of $932,743.82 to Livingston & Mattesich. (Ex. 305.) In fall of 2003, Mendoza formed the firm Malovos & Mendoza LLP. (Ex. 64.) Mendoza's final invoice from Livingston & Mattesich reflects an unpaid balance due of $336.50. (Ex. 500.)

Mendoza testified that, through late 2003 and early 2004, Atlantic Mutual paid bills slowly, but that she received responses on bill inquiries "fairly quickly." For example, on February 10, 2004, Mendoza sent Turner another status report and again complained that it had been "about 60 days" since receiving the last payment. (Ex. 79.) Then, on February 23, 2004, Mendoza received a payment of $71,985.53 on her December and January invoices, paying the balance due in full. (Ex. 502 at 75.) By November 2004, after receiving a payment of $100,239.41, Mendoza's invoice reflected a balance of $107,479.63. (Ex. 502 at 181.)

In August 2005, Turner informed Mendoza that Mendoza's bills would be subsequently subject to independent auditing. (Ex. 105.) In September, Atlantic Mutual issued a check for $31,438.17 to Malovos & Mendoza for Mendoza's January–April invoices. (Ex. 117.) This payment reflected deductions of $79,027.00 in questioned fees and $1,471.84 in questioned expenses by the independent audit. (Ex 116.) Mendoza objected to the deductions, contending that she had never received any billing guidelines from Atlantic Mutual. (Ex. 118.)

On October 4, 2005, Mendoza informed Turner that she would be raising her hourly rate from $200 an hour to $300 an hour. (Ex. 125.) On October 28, 2005, Atlantic Mutual issued Mendoza a check for $77,442.80 for Mendoza's fees from May 2005 to August 2005. The fees had been audited and reduced from an invoice billing $151,491.12. (Ex. 127.)

The reductions and audits continued through 2006 and 2007, with defendants asserting limitations on the amount of time spent on research, (Ex. 174), and objecting to the billing rates of Joel Baiocchi, a solo practitioner who had worked with Mendoza at Livingston & Mattesich and who was now assisting Mendoza on a contract basis, (Ex. 176).

On October 19, 2007, defendants' coverage attorney Gary Selvin sent Mendoza a letter seeking an accounting of Mendoza's unpaid invoices in order to address the billing dispute. (Ex. 237.) In the letter, Selvin promised to reimburse Mendoza $1,000 for related clerical expenses and promised a $100,000 "good faith" payment toward the outstanding fees owed. (*Id.*) Defendants sent the check to Malovos & Mendoza on October 22, 2007. (Ex. 239.) This was the last check defendants would send Mendoza. On October 27, 2007, Mendoza sent a short response promising to get back to defendants. (Ex. 240.)

On December 12, 2007, Selvin sent Mendoza another letter reiterating defendants' request that Mendoza compile all outstanding bills in order to "move forward on the billing issues." (Ex. 255.) Mendoza testified that she never responded to the letter. By that time, defendants had paid Malovos & Mendoza a total of $1,757,211.52 dating back to 2003. At no point did Mendoza seek payment directly from plaintiffs.

In 2007, Mennemeier, Glassman & Stroud associated in as additional Cumis counsel to assist in the defense of the cross-complaint. (Ex. 181.) Defendants ultimately paid the firm $382,082.98. (Ex. 305.) Andy Stroud testified that the firm signed an agreement with defendants and is not seeking any further payments in the matter.

In January 2007, the discovery referee in the PHL cross-action issued a report recommending sanctions under California Code of Civil Procedure section 128.5 against Dr. Wallis, Mr. Wallis, and Mendoza for the violation of a protective order and obtaining information that was inadvertently not filed under seal. (Ex. 514.) In April 2007, the trial court adopted the referee's recommendations and awarded sanctions of $43,678.42 jointly and severally against Mendoza and plaintiffs. (*Id.*)

Defendants agreed to fund the appeal of the sanctions motion under a reservation of rights, but refused to fund Mendoza's defense. (Ex. 254.) The Third District Court of Appeal upheld the sanctions order, and the California Supreme Court ultimately denied review. Defendants paid Mennemeier, Glassman & Stroud $115,995.90 to defend the sanctions motion on appeal. (Ex. 505.) Dr. Wallis paid the sanctions award herself.

By the end of October 2008, at which time plaintiffs filed the complaint in this action, Mendoza's invoices reflected a balance due of $872,927.59, some of which comprised interest on the difference between the previous payments defendants made and the total Mendoza sought. (Ex. 503 at 3.)

In May 2009, Mennemeier, Glassman & Stroud withdrew as *Cumis* counsel for plaintiffs, citing a breakdown in the attorney-client relationship, as well as "ongoing differences" with Mendoza. (Ex. OOO at 120.) At trial, Stroud testified that the reasons for withdrawal were not related to Centennial or Atlantic Mutual. That month, Mendoza also attempted to withdraw from the case but the trial judge denied her motion.

Subsequently, plaintiffs engaged Sedgwick, Detert, Moran & Arnold LLP to represent Dr. Wallis, (Ex. 349), and Michael Wilcox of Bullivant Houser Bailey, PC, to represent Dr. Wallis and Hygeia. (Ex. 338.) Wilcox, who had already been involved in the matter representing Mr. Wallis on a limited basis, (*id.*), testified that he did not understand his role to be *Cumis* counsel, but acknowledged that the insurers did pay his firm's bills. At trial, both Steve Roland of Sedgwick and Wilcox of Bullivant testified they were not seeking to collect any unpaid fees from plaintiffs. Sedgwick later withdrew because Mendoza accused the firm of engaging in unethical conduct. (Ex. 491.)

On July 20, 2009, the parties reached a mediated settlement of the PHL cross-action. (Ex. H.) According to a handwritten agreement, defendants agreed to pay PHL $2 million, PHL agreed to pay plaintiffs $173,000 to compensate for a second sanctions award Hygieia paid, and PHL agreed to dismiss the cross-complaint against plaintiffs. (*Id.*) The agreement allowed Dr. Wallis to continue pursuing her complaint against PHL. (*Id.*)

PHL dismissed the cross-complaint on July 6, 2010. Following the settlement of the cross-action, the trial court entered judgment on the 2000 trial of plaintiffs' complaint against PHL. (Ex. NNN at 10). The judgment against PHL included $1,944,997 on the jury's fraud verdict, $500,000 on the jury's punitive damages verdict, and $671,259 on the equitable claims. (*Id.*) However, in calculating prejudgment interest on the claims, the trial judge offset the amount of compensatory

damages awarded to Dr. Wallis by the amount of the settlement on PHL's cross-complaint. (*Id.*) The parties refer to this calculation as "the offset."

On October 17, 2013, however, the Third District Court of Appeal reversed the trial court's calculation of damages based on the offset and held that the trial judge should have calculated pre-judgment interest solely off Dr. Wallis's judgment. (*Id.*)

## B. *Procedural Background*

Plaintiffs filed this action on October 27, 2008, bringing claims for breach of the duty to defend and breach of the implied covenant of good faith and fair dealing, (Docket No. 1), as well as a claim for breach of fiduciary duty that the court later dismissed on defendants' motion for judgment on the pleadings. (Docket No. 17.) On December 23, 2008, defendants filed counterclaims against plaintiffs for declaratory relief regarding the reasonableness of *Cumis* counsel's fees and the duty to indemnify or defend plaintiffs for breach of the protective order. (Docket No. 9.) Defendants also filed the TPC against Mendoza alleging a single claim for declaratory relief and reimbursement of any and all sums paid for the purpose of defending Mendoza against the motion for sanctions. (*Id.*)

On April 16, 2009, the court granted defendants' motion to compel arbitration under California Civil Code section 2860(c) "with respect to the amount of attorney's fees allegedly owed to *Cumis* counsel." (Docket No. 41.) The court retained jurisdiction "over issues not squarely involving the calculation of *Cumis* counsel fees." (*Id.*) On June 25, 2010, 2010 WL 2612734, the court reaffirmed this Order on plaintiffs' motion for reconsideration, holding that the "mere fact that plaintiffs' Complaint includes causes of action for bad faith and breach of contract does not ex-

empt the *Cumis* fee dispute from section 2860 arbitration." (Docket No. 121.)

In July 20, 2009, the PHL cross-action settled, but the settlement agreement also included terms purporting to settle the present action, with the exception of claims subject to the court's April 16, 2009, order to compel arbitration. (Ex. H.) The agreement contained the provision that "this release will be reduced to a formal release to be executed by all parties." (*Id.*) The document went on to state, however, that "this agreement is binding upon all signators, whether or not the parties execute a formal agreement." (*Id.*)

On January 20, 2010, 2010 WL 318308, the court denied plaintiffs' motion to enforce the July 20, 2009, agreement. (Docket No. 74.) On June 25, 2010, the court denied defendants' motion to enforce the agreement, finding that, because it was uncertain whether the July 2009 document was intended to be a completed agreement and the parties proceeded to dispute the terms of the agreement, it appeared "that the parties never had a meeting of the minds." (Docket No. 120.)

In September 2010, Centennial and Atlantic Mutual were declared insolvent and placed into Rehabilitation Status by the Superintendent of Insurance of the State of New York. (Docket No. 122.) On December 7, 2010, the court ordered the action stayed. (Docket No. 124.) The court lifted the stay on May 1, 2012, 2012 WL 1552766. (Docket No. 141.)

On February 27, 2013, the court granted Atlantic Mutual's motion for judgment on the pleadings, holding that plaintiffs had not sufficiently alleged that Atlantic Mutual was a party to the insurance policy. (Docket No. 212.) Plaintiffs filed an amended complaint on March 20, 2013, (Docket No. 214), which the court ordered stricken after plaintiffs included new

claims. (Docket No. 216.) Plaintiffs filed their current operative complaint on April 4, 2013, bringing claims for declaratory relief, breach of insurance contract, and breach of the implied covenant of good faith and fair dealing. (Docket No. 217). On July 19, 2013, 2013 WL 3803971, the court granted defendants' motion to dismiss the declaratory relief claim. (Docket No. 228.)

## II. *Discussion*

### A. *Plaintiffs' Breach of Contract Claim*

Plaintiffs first bring a claim for breach of contract, contending that defendants' delay and reduction of payments to plaintiffs' counsel constituted a breach of defendants' duty to defend under the Policy. As set forth below, the court finds that Centennial and Atlantic did not breach their duty to defend. Further, even if defendants breached their duty, the court finds that plaintiffs did not suffer any damages as a result.

### 1. *Defendants Did Not Breach Their Duty to Defend*

Under the Policy, defendants had a duty to defend against covered third party claims by mounting and funding a defense. *Gray Cary Ware & Freidenrich v. Vigilant Ins. Co.,* 114 Cal.App.4th 1185, 1189, 8 Cal.Rptr.3d 475 (4th Dist.2004). This duty included "providing competent counsel and paying all reasonable and necessary costs." *Id.* (citing *Aerojet–Gen. Corp. v. Transp. Indem. Co.,* 17 Cal.4th 38, 57–58, 70 Cal. Rptr.2d 118, 948 P.2d 909 (1997)).

■ "Where, as here, an insurer provides a defense under a reservation of rights, a conflict of interest may arise between the insurer and its insured, providing the insured with the right to demand independent counsel," also known as *Cumis* counsel. *Id.* at 1190, 8 Cal.Rptr.3d 475 (citing *San Diego Navy Fed. Credit Union v. Cumis Ins. Soc'y, Inc.,* 162 Cal. App.3d 358, 364, 208 Cal.Rptr. 494 (4th Dist.1984)). By statute, the insurer must pay *Cumis* counsel only those fees equivalent "to the rates which are actually paid by the insurer to attorneys retained by it in the ordinary course of business in the defense of similar actions in the community where the claim arose or is being defended." Cal. Civ.Code § 2860(c). Unless otherwise provided for in an agreement between the parties, "[a]ny dispute concerning attorney's fees ... shall be resolved by final and binding arbitration by a single neutral arbitrator selected by the parties to the dispute." *Id.*

In some circumstances amounting to a breach of the duty to defend, however, an insurer may forfeit its right to arbitrate under section 2860.[2] In one case, the failure to pay at all in two actions, and payment of $130,579.40 out of $2,253,433.48 billed in another, constituted a breach of the insurers' duty to defend sufficient to extinguish their right to compel arbitration under section 2860. *Seagate Tech. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.,* 737 F.Supp.2d 1013, 1017 (N.D.Cal. 2010). In another, an insurer's improper refusal to accept tender of the insured's defense precluded arbitration under sec-

---

**2.** "California Courts of Appeals [sic] have been somewhat inconsistent in their treatment of the timing of arbitration within larger coverage actions over the duty to defend." *Arrowood Indem. Co. v. Bel Air Mart,* No. 2:11–CV–00976–JAM, 2013 WL 2434830, at *5 (E.D.Cal. June 4, 2013). What is clear, however, is that the trial court must initially resolve the question of whether the insurer *owes* a duty to defend before submitting any fee dispute to arbitration. *See, e.g., Handy v. First Interstate Bank,* 13 Cal.App.4th 917, 927, 16 Cal.Rptr.2d 770 (2d Dist.1993). Such circumstances are not present here, as defendants do not dispute they owed a duty to defend.

tion 2860. *Concept Enters., Inc. v. Hartford Ins. Co. of the Midwest,* No. CV007267NM(JWJX), 2001 WL 34050685, at *4 (C.D.Cal. May 22, 2001); *see also Atmel Corp. v. St. Paul Fire & Marine,* 426 F.Supp.2d 1039, 1047 (N.D.Cal.2005) ("Here, it is undisputed that St. Paul did not defend Atmel in the *Seagate* Action, and thus the Court concludes defendant cannot avail itself of the protections and limitations set forth in § 2860."); *Janopaul + Block Cos. v. Superior Court,* 200 Cal.App.4th 1239, 1248, 133 Cal.Rptr.3d 380 (4th Dist.2011) (holding that insurer who "waited more than two years to accept the tender of defense and nearly three years to begin paying for that defense" could not arbitrate amount of fees owed before court determined issues of bad faith and breach of the duty to defend).[3]

The present case is distinguishable. Here, defendants acknowledged their duty to defend the plaintiffs against the PHL cross-complaint and agreed to provide independent *Cumis* counsel pursuant to section 2860. Thus the principles embodied in *Concept Enterprises,* 2001 WL 34050685, at *4, and *Atmel,* 426 F.Supp.2d at 1047, wherein the insurer could not seek arbitration after making an improper refusal to defend, do not apply.

■ Although defendants did not pay Mendoza's bills in full, they were required only to pay fees that were "reasonable and necessary" and therefore withholding any portion of fees cannot constitute a breach *per se. See NextG Networks, Inc. v. OneBeacon Am. Ins. Co.,* No. 11–CV–05318–RMW, 2012 WL 3017689, at *5 (N.D.Cal. July 23, 2012) ("*Aerojet* does not impose on

an insurer a prophylactic duty to assume expenses alleged by its insured to be 'reasonable and necessary' to minimize liability in a covered action."). Plaintiffs have failed to offer any evidence establishing that the withheld fees were "reasonable and necessary" to their defense.

Moreover, the deductions to payments made by defendants here did not rise to the levels in *Seagate,* where the insurers paid only $130,579.40 out of $2,253,433.48 billed, a percentage below six percent. 737 F.Supp.2d at 1015. In contrast, defendants had paid Mendoza's firms $2,716,147.36 in attorneys' fees through October 2007, (Ex. 305), after which time defendants made no further payments to Mendoza but continued paying other *Cumis* counsel. By the time plaintiffs filed the complaint in this case, Mendoza claimed a balance due of $872,927.59. (Ex. 503 at 3.) Mendoza's final invoice showing any activity relating to the cross-complaint, dated October 1, 2010, reflects a balance of $1,288,039.46 owed, some of which comprised of interest on the difference between the previous payments defendants made and the total Mendoza sought. (*Id.* at 50.) Because Mendoza still received a substantial amount of funding, the court finds the deficiencies in payments did not rise to the level of a breach of defendants' duty under the insurance contract, and defendants did not forfeit their right to arbitrate the fee dispute.

Thus, plaintiffs' claims seeking reimbursement of unpaid fees and costs to Mendoza and Baiocchi, most of whose fees are billed on Mendoza's invoices, are sub-

---

**3.** Plaintiffs also rely on a recent California Court of Appeal case holding that an insurer who initially refused to accept tender of the defense in a matter for which it had a duty to defend could not compel arbitration. *J.R. Mktg., L.L.C. v. Hartford Cas. Ins. Co.,* 216 Cal.App.4th 1444, 158 Cal.Rptr.3d 41 (1st Dist.2013), review granted and opinion superseded sub nom. *Hartford Cas. Ins. v. J.R. Mktg.,* 162 Cal. Rptr.3d 1, 308 P.3d 860 (2013). Because the California Supreme Court has granted review of the case, it is now considered unpublished. Cal. R. Ct. 8.1105.

ject to section 2860 arbitration. Without a determination from the arbitrator that the full amount of fees sought by Mendoza and Baiocchi were "reasonable and necessary," defendants' withholding of the full amount of fees cannot serve as a basis for plaintiffs' breach of contract and bad faith claims here. *Cf. Behnke v. State Farm Gen. Ins. Co.*, 196 Cal.App.4th 1443, 1468, 127 Cal.Rptr.3d 372 (4th Dist.2011) (holding that breach of contract claim for unpaid fees depended on arbitrator's determination of what fees were reasonable, and awarding summary judgment to insurer on claim after insurer paid amount owed under arbitration award).

Accordingly, because plaintiffs have not proved that defendants withheld reasonable or necessary fees to the defense, the court finds that defendants did not breach their duty to defend.[4]

### 2. *Plaintiffs Did Not Suffer Damages from Any Breach*

Even if defendants breached their duty to defend, plaintiffs have not shown by a preponderance of the evidence that they suffered any damages as a result. "A breach of contract is not actionable without damage." *Bramalea Cal., Inc. v. Reliable Interiors, Inc.*, 119 Cal.App.4th 468, 473, 14 Cal.Rptr.3d 302 (4th Dist.2004). "The general measure of damages for a breach of the duty to defend an insured ... are the costs and attorney fees expended by the insured defending the underlying action." *Emerald Bay Cmty. Ass'n v. Gold-en Eagle Ins. Corp.*, 130 Cal.App.4th 1078, 1088–89, 31 Cal.Rptr.3d 43 (4th Dist.2005); *see also Amato v. Mercury Casualty Co.*, 53 Cal.App.4th 825, 831, 61 Cal.Rptr.2d 909 (2d Dist.1997) ("Where an insured mounts a defense at the insured's own expense following the insurer's refusal to defend, the usual contract damages are the costs of the defense."). "A plaintiff may not recover damages for an unpaid liability to a third party, unless the plaintiff proves to a reasonable certainty that the liability could and would be enforced by the third party against the plaintiff or that the plaintiff otherwise could and would satisfy the obligation." *Green Wood Indus. Co. v. Forceman Intern. Dev. Grp., Inc.*, 156 Cal. App.4th 766, 776, 67 Cal.Rptr.3d 624 (2d Dist.2007).

■■■ Here, plaintiffs have not persuaded the court that any of them suffered damages from any act or omission of defendants. Specifically, plaintiffs have not shown by a preponderance of the evidence that they ever had, or will have, to make up the shortfall between the fees Mendoza billed and the amount defendants paid, much less that plaintiffs suffered any financial impact defending against the cross-complaint. *See Amato*, 53 Cal.App.4th at 831, 61 Cal.Rptr.2d 909. And whatever amount may be due to Mendoza beyond the sums already paid will be adjudicated in the arbitration. Simply because plaintiffs say they owe Mendoza the full amount

---

4. Plaintiffs also contend that defendants breached the duty to defend by imposing billing guidelines on *Cumis* counsel, citing dicta from one California Court of Appeal decision hypothesizing that "[i]nsurer-imposed restrictions on discovery or other litigation costs may well violate the insurer's duty to defend." *Dynamic Concepts, Inc. v. Truck Ins. Exch.*, 61 Cal.App.4th 999, 1009, 71 Cal.Rptr.2d 882 (4th Dist.1998). The court is not aware of any published case applying this dicta and will not do so here. Even though such limita-

tions "may well" breach the duty to defend in some instances, plaintiffs have not shown the billing guidelines imposed by defendants were unreasonable or unnecessary. In any event, the imposition of billing guidelines is not actionable here since there is no evidence that plaintiffs' attorneys were precluded from engaging in any specific discovery, hiring of expert witnesses, conducting research, or pursuing any other litigation tactic. Nor have plaintiffs demonstrated they suffered any damages as a result of the billing guidelines.

she billed does not make defendants liable beyond what the arbitrator determines to be reasonable and necessary. *See Behnke*, 196 Cal.App.4th at 1468–69, 127 Cal. Rptr.3d 372 (holding that insurer was not liable to insured, even though insured had granted security interest in insured's residence to *Cumis* counsel to cover unpaid fees, when insurer paid amount arbitrator deemed reasonable).

In addition, each attorney who also worked on the case alongside Mendoza testified that he had received payment from defendants, and each stated that there no was no intention to seek further payment from plaintiffs. For example, Wilcox testified that he believed all of his firm's bills were paid by the insurers. Roland testified that his firm was no longer looking for any payment, and was not owed any fees by plaintiffs. And Stroud testified that plaintiffs did not owe his firm any outstanding fees. Thus, even if defendants' delay and reduction in payments to plaintiffs' attorneys amounted to a breach of the duty to defend, the court finds that plaintiffs did not suffer any damages therefrom because none of the attorneys sought or seek payment from plaintiffs. Any breach, therefore, is not actionable.

*See Emerald Bay*, 130 Cal.App.4th at 1088–89, 31 Cal.Rptr.3d 43 (finding plaintiff insured could not show it suffered any contract damages when insurer and third party paid its legal expenses).[5]

Plaintiffs demonstrate only one potential instance of pecuniary loss relating to owed attorneys' fees or costs. At trial, Mr. Wallis testified that he personally paid Baiocchi in relation to the settlement with the estate of a PHL principal that was not party to the 2009 settlement. Mr. Wallis provided no documentation to substantiate this payment, nor did he testify that he ever sought reimbursement from defendants for this payment. Without such documentation, the court cannot determine whether these payments related to work done on the complaint, for which the defendants owed no coverage, or the cross-complaint. At the time, Mennemeier, Glassman & Stroud, as well as Mendoza, were representing plaintiffs on the cross-complaint, while Baiocchi was counsel of record on the underlying complaint, which was not subject to the insurers' duty to defend. Later, after Mennemeier, Glassman & Stroud withdrew, Wilcox was attorney of record for Mr. Wallis on the cross-complaint while Sedgwick Detert, Moran & Arnold represented Dr. Wallis.[6] Ac-

---

**5.** Moreover, even if plaintiffs are correct that defendants breached their duty to defend and therefore lost the right to arbitrate under section 2860, plaintiffs are incorrect that they would be entitled to all fees Mendoza billed regardless of whether those fees where reasonable and necessary to plaintiffs' defense. *See NextG Networks, Inc.*, 2012 WL 3017689, at *5 ("[W]here the insurer refuses to defend, the insured may recover both any excess judgment and the 'expenses of litigation.' But an insured's expenditures cannot be recoverable simply because the insured elected to incur them; otherwise, an insurer could be held liable for expenses that far exceed those necessary to defend an action covered by the policy. Thus, *Aerojet* and its progeny establish an objective standard, requiring the court to consider 'whether the benefits of the [in-

sured's] strategy are worth the cost.' Put another way, *Aerojet* stands for the proposition that where an insurer refuses to defend, it is liable for any costs it would reasonably have incurred had it complied with its contractual obligation in the first place.") (internal citations omitted) (second alteration in original). Here, plaintiffs have not provided any persuasive evidence, in the form of expert testimony or even their own testimony, that the withheld fees were reasonable and necessary to the defense of the cross-complaint. Therefore, even assuming plaintiffs are entitled to damages based on defendants' withholding of fees, they have failed to carry their burden in establishing the amount of those damages.

**6.** Sedgwick's 2009 "to-do list," which received defendants' approval, includes an en-

cordingly, plaintiffs have not shown by a preponderance of the evidence that any payments made by Mr. Wallis to Baiocchi constituted damages from defendants' failure to defend against the cross-complaint.

Because any fees owed to Mendoza and Baiocchi are subject to arbitration under section 2680, Mendoza did not seek any payment from plaintiffs, and the other attorneys who represented plaintiffs have not sought and do not intend to seek unpaid fees from plaintiffs, plaintiffs have not shown by a preponderance of the evidence much less "to a reasonable certainty" that any third party liability could and would be enforced against them. *Green Wood*, 156 Cal.App.4th at 776, 67 Cal.Rptr.3d 624. Accordingly, because plaintiffs have not satisfied the court that they incurred any damages, much less that defendants breached the duty to defend in the first place, the court will enter judgment in favor of defendants on the breach of contract claim.

### B. *Plaintiffs' Bad Faith Claim*

Plaintiffs' second claim is for breach of the implied covenant of good faith and fair dealing. For the reasons discussed below, the court does not find that defendants engaged in bad faith by unreasonably withholding any benefits under the Policy. Further, even if plaintiffs could show bad faith, plaintiffs have failed to show that they suffered any actionable damages as a result.

#### 1. *Plaintiffs Have Not Shown that Defendants Dealt in Bad Faith*

■ "In order to establish a breach of the implied covenant of good faith and fair

dealing under California law, a plaintiff must show: (1) benefits due under the policy were withheld; and (2) the reason for withholding benefits was unreasonable or without proper cause." *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001) (citing *Love v. Fire Ins. Exch.*, 221 Cal.App.3d 1136, 1151, 271 Cal.Rptr. 246 (4th Dist.1990)); *see also Dynamic Concepts, Inc. v. Truck Ins. Exch.*, 61 Cal. App.4th 999, 1010, 71 Cal.Rptr.2d 882 (4th Dist.1998) ("A carrier is subject to tort liability for bad faith only where it unreasonably fails to provide benefits due under the policy or the law.").

■ The covenant of good faith and fair dealing "is implied as a supplement to the express contractual covenants." *Waller v. Truck Ins. Exch., Inc.*, 11 Cal.4th 1, 36, 44 Cal.Rptr.2d 370, 900 P.2d 619 (1995). "Absent that contractual right, however, the implied covenant has nothing upon which to act as a supplement, and should not be endowed with an existence independent of its contractual underpinnings." *Id.* (internal quotation marks omitted).

Initially, because plaintiffs have not proved a breach of contract for the reasons discussed above, they have not shown that any benefits due under the policy were withheld. Even if plaintiffs could prove they were denied benefits under the policy, the court finds plaintiffs have failed to prove by a preponderance of the evidence that "the reason for withholding benefits was unreasonable or without proper cause." *Guebara*, 237 F.3d at 992.

The benefits which plaintiffs argue were withheld were the fees allegedly due to plaintiffs' *Cumis* counsel. Plaintiffs have

try for "Hanzo settlement." (Ex. 364.) Thus, while the evidence may support an inference that this settlement was related to defense of the cross-complaint, it also supports an inference that defendants were already paying ex-

isting *Cumis* counsel to handle the settlement. Whether Mr. Wallis's payments to Baiocchi were reasonable and necessary to the defense, therefore, may be addressed in the section 2860 arbitration.

not proved, however, that the failure to pay the full amount of fees charged by Mendoza and Baiocchi was unreasonable. For the reasons discussed above, whether the fees and costs charged by Mendoza and Baiocchi were reasonable and necessary to the defense is a question to be determined by the section 2860 arbitration, not by this court. If the arbitrator determines that defendants owe an amount less than the amount billed by Mendoza and Baiocchi, defendants' decision to dispute the billings would not have been unreasonable. *See Behnke,* 196 Cal.App.4th at 1470, 127 Cal.Rptr.3d 372 (holding that insurer's conduct in disputing billed amount of fees and costs by plaintiff's attorney was reasonable and not bad faith because arbitrator awarded amount less than the amount originally billed). The arbitration has not yet occurred, and any determination made by this court as to its result would be improperly speculative. As with plaintiffs' breach of contract claim, plaintiffs have not provided any testimony—expert or otherwise—or other evidence that the full amount of fees charged was reasonable or that the failure to pay in full was unreasonable. Accordingly, the refusal by defendants to pay the full amount of fees charged by Mendoza and Baiocchi cannot serve as a basis for plaintiffs' claim of bad faith.

Plaintiffs also argue that defendants acted unreasonably by forcing plaintiffs to accept a settlement of the PHL cross-complaint despite Dr. Wallis's preference to "seek vindication" and continue litigation. As a threshold matter, it is not clear whether this issue is even properly before the court. Plaintiffs added the allegations regarding the settlement in an amended complaint filed March 20, 2013. (Docket No. 214.) The court had previously given plaintiffs leave to amend after granting Atlantic Mutual's motion for judgment on the pleadings, holding that plaintiffs had

not sufficiently alleged that Atlantic Mutual was a party to the insurance policy. (Docket No. 212.) However, after plaintiffs' amended complaint included the new allegations regarding the settlement, the court ordered the amended complaint stricken. (Docket No. 216.) Plaintiffs' current operative complaint, (Docket No. 217), does not contain these allegations. Defendants objected to the inclusion of the claims in defendants' trial brief, (Docket No. 246), and the court has ruled that neither side may amend their pleadings to conform to proof because doing so would prejudice the other side. *See* Fed. R. Civ P. 15(b)(1) ("The court should freely permit an amendment when doing so will aid in presenting the merits and the objecting party fails to satisfy the court that the evidence would prejudice that party's action or defense on the merits."); *see also Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1522 (9th Cir.1985) ("The question whether the parties have impliedly consented to the trial of an issue lies within the discretion of the trial court."), *superseded by statute on other grounds as stated in Northrop Corp. v. Triad Int'l Mktg. S.A.,* 842 F.2d 1154 (9th Cir.1988) (per curiam).

More importantly, assuming the issue is properly before the court, plaintiffs have failed to prove by a preponderance of the evidence that defendants acted unreasonably with regard to the settlement negotiations. Multiple attorneys testified that, because plaintiffs faced a potential adverse judgment of $15–20 million, settlement was a superior option to further litigating the cross-complaint. Stroud testified that he considered the case to be a good one for settlement based on the significant downside risk facing plaintiffs. Roland corroborated the assessment that plaintiffs faced a potential adverse judgment of $15–20 million. The court finds the testimony of

these witnesses credible and persuasive in their determination that settlement was in the best interests of Dr. and Mr. Wallis. And even Dr. Wallis testified at trial that she made her own educated decision to settle the cross-complaint, in an effort to protect herself against the prospect of significant liability. If the court learned anything from the demeanor of Dr. Wallis while testifying in this case it is that she is a strong willed individual who makes up her own mind on decisions that may affect her interests. The court cannot believe that she could be coerced into any decision.

Plaintiffs further argue that defendants committed bad faith at the mediation by lying about the impending insolvency of Centennial and Atlantic Mutual in order to induce settlement. Absent proof that defendants knowingly misrepresented their financial status, however, the fact that Centennial and Atlantic Mutual lasted longer than defendants predicted does not point to any bad faith, nor does it change the remote possibility that the insurers would have survived the duration of an entire trial and appeal of the cross-complaint. Given the undisputed fact that the insurers faced, at the very least, an uncertain financial future, the decision to settle was entirely reasonable.[7] Accordingly, even if settlement was a result of some subtle pressure by defendants, the court does not find that any actions taken by defendants with respect to the settlement negotiations were "unreasonable or without proper cause." *Guebara*, 237 F.3d at 992.

Finally, plaintiffs have not proved that defendants unreasonably interfered with the ability of counsel to litigate the case. Instead, the record shows that Mendoza and plaintiffs themselves caused much of the difficulties that ultimately resulted in the withdrawal of counsel. For example, Stroud testified, and the record shows, that Mennemeier, Glassman & Stroud sought to withdraw from its representation because of a breakdown in the attorney-client relationship, as well as "ongoing differences" with Mendoza. (Ex. OOO at 120.) Further, Stroud specifically testified that the reasons for withdrawal were not related to Centennial or Atlantic Mutual. In addition, Roland testified, and the record reflects, that Sedgwick Detert, Moran & Arnold withdrew because Mendoza accused the firm of engaging in unethical conduct. (Ex. 491.) Perhaps plaintiffs' best evidence of any interference are disparaging comments regarding plaintiffs made by Selvin to attorneys from PHL. (Ex. 474.) While these remarks are not of the kind that should be condoned, they occurred after the cross-complaint settled and are insufficient to support a finding of bad faith on their own.

Thus, because the record shows neither that any reductions in payments affected plaintiffs' representation nor that defendants otherwise interfered with the defense, plaintiffs have not proven that they were unreasonably deprived of a policy benefit of full representation in defense of the cross-complaint.[8]

---

7. Any representations by defendants during mediation regarding their impending insolvency may simply have been efforts to put pressure on PHL—not plaintiffs—to settle the cross-complaint.

8. Plaintiffs' contentions that defendants otherwise interfered with the ability of counsel to litigate the case are without merit and unsupported by the evidence. For example, plaintiffs claim that defendants prevented Mennemeier, Glassman & Stroud from fully litigating the defense, resulting in an extensive "to-do list" by the time that Sedgwick Detert, Moran & Arnold assumed the defense in 2009. (Ex. 364.) The court does not find such accusations credible, given that Roland testified that defendants approved all items on Sedgwick's list, save for the funding of a

## 2. *Plaintiffs Did Not Suffer Damages as a Result of Any Act or Omission of Defendants*

■ Even if plaintiffs had sufficiently demonstrated an unreasonable denial of benefits under the Policy, plaintiffs have completely failed to prove any damages as a result of defendants' alleged bad faith.

On the outset, plaintiffs' could not recover unpaid attorneys' fees as damages for their claim of bad faith for the same reasons stated with regard to their breach of contract claim. As with the breach of contract claim, the amount of attorneys' fees owed to Mendoza and Baiocchi is subject to arbitration, and plaintiffs' other counsel do not claim that plaintiffs owe them anything.

Aside from fees, plaintiffs argue that defendants' alleged bad faith resulted in (1) the failure to complete the purported settlement in 2003; (2) the inability of their attorneys to complete all of the tasks necessary to marshal their defense; and (3) a weakened position at the 2009 mediation. Even if all that were so, it resulted in no economic loss to plaintiffs because it was defendants, not plaintiffs, who ultimately paid the full amount of the 2009 settlement, and any remaining damages would be the attorneys' fees incurred after 2003, which, for the reasons stated above, are not actionable.

Despite plaintiffs' contentions that they would have prevailed if Mendoza had fully litigated the cross-complaint to a verdict, the court finds that such an outcome is implausible. More importantly, even if plaintiffs had prevailed on the cross-complaint at trial, the best result they could have achieved would be a verdict that required them to pay nothing on the cross-complaint. Because defendants bore the full cost of the settlement, the net economic result to plaintiffs was the same as if they had prevailed at trial—they paid nothing. Plaintiffs have not demonstrated by a preponderance of the evidence that, but for defendants' conduct, it was more likely than not that plaintiffs would have received a superior outcome from the settlement, in which defendants paid PHL $2 million and PHL agreed to dismiss the cross-complaint against plaintiffs. Plaintiffs, therefore, have not proven any economic damages from the alleged bad faith of defendants in litigating, and ultimately settling, the cross-complaint.

Plaintiffs argue that they suffered damages as a result of the 2009 settlement because the state trial court applied the "offset" to reduce the amount of prejudgment interest owed to plaintiffs on their 2000 jury verdict. Plaintiffs' argument essentially boils down to the theory that, had Mendoza received full funding from the insurers, she would have maintained the lead in litigating the defense of the cross-complaint and would have heeded Dr. Wallis's wishes not to settle, resulting in a successful defense verdict on the cross-complaint and no offset. However, this theory is counterfactual, entirely speculative, and insufficient to carry plaintiffs' burden of proof.

First, there is no indication that full funding from the insurers would have resulted in any different result in the case. Multiple attorneys who worked on defense of the cross-complaint testified at trial that the reduced payments from the insurers did not impact their defense of the case. Stroud testified that while the payment

mock trial. Plaintiffs' protestations that Mennemeier, Glassman & Stroud failed to advance the litigation especially ring hollow given the time and effort the firm had to expend opposing the bad faith sanctions levied against plaintiffs and Mendoza for their behavior during the litigation.

issues impacted who could staff the case at Mennemeier, Glassman & Stroud, the firm did not make any different strategic choices based on the payments. Stroud also testified that the payment issues did not affect the firm's representation on the case, and that he did not recall plaintiffs ever stating a concern with his firm adequately representing them. Wilcox affirmed this, testifying that while Stroud had expressed some concerns with billing reductions, Stroud never indicated that the issue was impacting Stroud's representation of plaintiffs.

■ Second, as to the consequence of the offset, any potential damages to plaintiffs as a result of the offset are now entirely speculative given that the California Court of Appeal overruled the trial court's application of the offset, rendering any damages from the offset moot. (*See* Ex. NNN.) "[I]t is fundamental that 'damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery.'" *Piscitelli v. Friedenberg*, 87 Cal.App.4th 953, 989, 105 Cal.Rptr.2d 88 (4th Dist.2001) (citing *Frustuck v. City of Fairfax*, 212 Cal. App.2d 345, 367–68, 28 Cal.Rptr. 357 (1963)). Although the offset could be reinstated by the Court of Appeal on rehearing or by the California Supreme Court on review, plaintiffs have failed to convince the court that it is more likely than not that such an outcome would occur. To the contrary, having read the opinion, this court concludes it is highly unlikely that it will be overturned. The court agrees with Stroud's testimony that it is rare for the California Supreme Court to overrule an appellate decision, and the court finds such

an outcome especially unlikely with an opinion as well-reasoned as this one. Accordingly, any damages to plaintiffs from the offset are speculative, uncertain, and insufficient to merit a finding of bad faith.

Plaintiffs also argue that bad faith on the part of defendants caused damages from the failed defense of the sanctions motion. However, as discussed above, Mennemeier, Glassman & Stroud, plaintiffs' defense counsel on the sanctions motion and appeal, withdrew from representing plaintiffs because of differences with the clients and co-counsel, not because of any actions by defendants. (Ex. OOO.) Further, as discussed below, defendants did not ultimately have a duty to defend plaintiffs against the sanctions motion. Because plaintiffs do not establish a causal relationship between defendants' actions and the sanctions award against plaintiffs, the failure to defend the sanctions motion cannot sustain a claim of bad faith.

Plaintiffs seek reimbursement for attorneys' fees incurred defending against the offset in state court on appeal after the cross-complaint had settled, but do not provide any authority tending to show that this fell within defendants' duty to defend against the cross-complaint.[9] Plaintiffs also seek future legal fees and costs resulting from defendants' failure to defend against the offset, as well as future legal fees associated with plaintiffs' efforts to protect their intellectual property rights, but do not provide any factual foundation to substantiate these claims. As "damages which are speculative, remote, imaginary, contingent, or merely possible cannot serve as a legal basis for recovery," *Pisci-*

---

9. Plaintiffs contend that defendants had a duty to fund the defense of all issues "reasonably related" to the cross-complaint and argue that the offset was such an issue. *Safeway Stores, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 64 F.3d 1282, 1289 (9th Cir.

1995). *Safeway*, however, does not stand for such a proposition, instead involving the apportionment of defense costs between an uninsured corporation and its insured officers and directors. *Id.*

*telli,* 87 Cal.App.4th at 989, 105 Cal. Rptr.2d 88, these assertions do not satisfy plaintiffs' burden of proving they are entitled to relief on their bad faith claim.

■ Finally, plaintiffs' bad faith claim seeks additional damages for emotional distress. Emotional distress damages are recoverable in bad faith cases "only when the insureds have suffered a financial loss." *Waters v. United Servs. Auto. Ass'n,* 41 Cal.App.4th 1063, 1069, 48 Cal. Rptr.2d 910 (2d Dist.1996). Such financial loss must be "actual, not merely potential." *Major v. W. Home Ins. Co.,* 169 Cal. App.4th 1197, 1214, 87 Cal.Rptr.3d 556 (4th Dist.2009). Because emotional distress damages are recoverable in bad faith cases "only when the insureds have suffered a financial loss," *Waters,* 41 Cal. App.4th at 1069, 48 Cal.Rptr.2d 910, and the court has found that plaintiffs have failed to prove a financial loss, plaintiffs are not entitled to any damages for emotional distress.

■ Moreover, the court is not persuaded that Dr. Wallis or any other plaintiff suffered emotional distress as a result of any act or omission on the part of defendants. Whatever emotional distress Dr. Wallis may have suffered is just as likely to have been caused by the prolongation of litigation, adverse rulings received along the way, and the stress of litigation itself. Although Dr. Wallis testified at length regarding the emotional distress she suffered as a result of Mendoza's emotional distress during the litigation, there is no authority for the proposition that a client may recover vicariously for the emotional distress of her attorney.

In sum, plaintiffs have not shown that they suffered any actionable harm, much less that defendants actually committed bad faith by unreasonably withholding policy benefits. Accordingly, because plaintiffs have failed to show by a preponderance of the evidence that they are entitled to relief on their bad faith claim, the court will enter judgment in favor of defendants on that claim.[10]

### C. *Defendants' Counterclaim for Declaratory Relief*

Defendants' counterclaim first seeks a judicial determination regarding the reasonableness of plaintiffs' *Cumis* counsel fees. On April 15, 2009, the court granted "defendants' motion to compel arbitration with respect to the amount of attorney's fees allegedly owed to *Cumis* counsel." (Docket No. 41.) The court retained jurisdiction, however, "over issues not squarely involving the calculation of *Cumis* counsel fees." (*Id.*) On June 25, 2010, the court reaffirmed this Order on plaintiffs' motion for reconsideration, holding that the "mere fact that plaintiffs' Complaint includes causes of action for bad faith and breach of contract does not exempt the *Cumis* fee dispute from section 2860 arbitration." (Docket No. 121.)

Defendants' counterclaim for declaratory relief regarding the reasonableness of plaintiffs' attorneys' fees fits squarely within the court's previous order to arbitrate *Cumis* counsel fees. The question of reasonableness depends on the arbitration ruling, and, absent a determination from the arbitrator, the court cannot grant such relief. Accordingly, the court will enter judgment for plaintiffs on the counterclaim

---

10. Because plaintiffs do not satisfy their burden of proving defendants unreasonably withheld policy benefits, plaintiffs are not entitled to damages in the form of the expenses in-

curred seeking unpaid benefits under *Brandt v. Superior Court,* 37 Cal.3d 813, 210 Cal. Rptr. 211, 693 P.2d 796 (1985).

regarding the reasonableness of plaintiffs' *Cumis* counsel fees.

D. *Defendants' Counterclaim Regarding Duty to Defend or Indemnify Breach of the Protective Order*

Defendants also seek a declaration that they had no duty to defend or indemnify plaintiffs or Mendoza in connection with the breach of the protective order and subsequent sanctions. Defendants seek reimbursement for fees and costs paid to plaintiffs' counsel to defend against and appeal the sanctions motion.

 The Supreme Court of California has recognized that an insurer that has provided a defense under a reservation of rights "has a right of reimbursement that is implied in law as quasi-contractual" for defense costs with respect to claims that "are not even potentially covered" by the applicable policy. *Buss v. Superior Court,* 16 Cal.4th 35, 50–51, 65 Cal.Rptr.2d 366, 939 P.2d 766 (1997). An insurer's right to reimbursement is based on the law of restitution and "such a right runs against the person who benefits from 'unjust enrichment' and in favor of the person who suffers loss thereby." *Id.* at 51, 65 Cal. Rptr.2d 366, 939 P.2d 766. Such "unjust enrichment" stems from "the insurer's bearing of unbargained-for defense costs." *Id.* Defendants are thus entitled to reimbursement if they can show by a preponderance of the evidence that defendants paid certain fees or expenses solely allocable to uncovered issues. *Id.* at 53, 65 Cal.Rptr.2d 366, 939 P.2d 766.

California Insurance Code section 533 states that "[a]n insurer is not liable for a loss caused by the wilful act of the in-sured." Pursuant to this provision, "a court-imposed award of sanctions under Code of Civil Procedure section 128.5, for bad faith conduct or tactics in engaging in litigation which is totally and completely without merit, cannot be shifted to that litigant's insurer." *Cal. Cas. Mgmt. Co. v. Martocchio,* 11 Cal.App.4th 1527, 1531, 15 Cal.Rptr.2d 277 (1992). Because such sanctions cannot be shifted to an insurer by law, it follows that such a penalty is "not even potentially covered" by an insurance policy. *Buss,* 16 Cal.4th at 50, 65 Cal.Rptr.2d 366, 939 P.2d 766.

 Here, plaintiffs and Mendoza were subject to court-ordered sanctions under section 128.5 to pay $43,678.00 jointly and severally. Although plaintiffs and Mendoza dispute the sanctions and claim that the various state courts, including the discovery referee, trial court, court of appeal, and California Supreme Court, all ruled incorrectly, the underlying merits of the sanctions motion are immaterial for the purposes of coverage under section 533. The question is not whether the actions of plaintiffs and Mendoza were in fact willful. The question is whether, in order to impose sanctions, the trial court necessarily had to find that plaintiffs and Mendoza engaged in conduct proscribed the statute. And, under *Martocchio,* it did.[11] 11 Cal.App.4th at 1534, 15 Cal. Rptr.2d 277 ("Such bad faith actions or tactics are ... acts which are always intentional and wrongful and in which harm is always inherent as a matter of law. They are patently 'wilful' acts for which insurance coverage is always proscribed by Insurance Code section 533 ...."). Because the sanctions order necessarily en-

11. Although *Gumabao v. Gumabao,* 150 Cal. App.3d 572, 577, 198 Cal.Rptr. 90 (2d Dist. 1984) suggests that a court may impose sanctions under section 128.5 for conduct that is not necessarily willful, the court finds the analysis of *Martocchio* controlling here, as that case addresses specifically whether such sanctions can be covered by insurance under section 533.

tailed a finding of conduct precluded from insurance coverage under section 533, plaintiffs were not even potentially covered under the policy, and defendants may seek reimbursement for costs expended in defending against the sanctions. *Buss*, 16 Cal.4th at 50, 65 Cal.Rptr.2d 366, 939 P.2d 766.

Because Centennial and Atlantic Mutual had no duty to defend against the sanctions motion, they are entitled to reimbursement of the attorneys' fees and costs paid to defend plaintiffs against the sanctions. The evidence demonstrates that defendants paid $115,995.90 to Mennemeier, Glassman & Stroud over the course of the defense of the sanctions motion appeal.[12] (Ex. 505.) Therefore, defendants are entitled to a judgment of $115,995.90 against plaintiffs on the counterclaim.

### E. *Defendants' TPC Against Mendoza*

Defendants' TPC seeks reimbursement from Mendoza for sums the insurers expended defending Mendoza against the sanctions motion. Defendants concede, however, "that an insurer may not obtain reimbursement for non-covered claims from defense counsel under ordinary circumstances," but claim, without citing any authority, that "these are not ordinary circumstances." (Defs.' Resp. to Pls.' Trial Brs. at 26:22–25 (Docket No. 250).) Further, the evidence shows that defendants expressed their desire not to fund the defense of Mendoza on the appeal of the sanctions order, (Ex. 254), and defendants

have not demonstrated which, if any, payments made to Mendoza's firm supported this work. In fact, defendants concede that the "amounts paid by Centennial are intertwined between the defense of [plaintiffs] and [Mendoza], such that the legal fees and costs cannot reasonably be allocated between either of them." (Defs.' Trial Br. at 26:13–15 (Docket No. 246).) Accordingly, because defendants failed to prove that Mendoza improperly received any fees relating to her own defense against the sanctions motion, they are not entitled to reimbursement and the court will render judgment in favor of Mendoza on the TPC.

For the foregoing reasons, JUDGMENT SHALL BE ENTERED in favor of defendants on all of plaintiffs' claims; in favor of plaintiffs on defendants' counterclaim for declaratory relief; in favor of defendants and against Dr. Wallis, Mr. Wallis, and Hygieia, jointly and severally, in the amount of $115,995.90 on defendants' counterclaim for indemnity; and in favor of third party defendant Mendoza on defendants' third party complaint.

The Clerk of the Court is instructed to enter judgment accordingly.

12. Plaintiffs contend that defendants cannot seek damages for their counterclaim because defendants failed to list any damages on their Rule 26 disclosures. *See* Fed.R.Civ.P. 26(a)(1)(A)(iii) (requiring, before trial, "a computation of each category of damages claimed by the disclosing party") The court has independently reviewed the evidence submitted on the issue of attorneys' fees incurred during the sanctions appeal. From those records the amount of fees paid by defendants to fund the sanctions appeal can be readily determined with reasonable certainty. Accordingly, the court finds failure to set forth the amount in the Rule 26 disclosure harmless. *See* Fed.R.Civ.P. 37(c)(1) ("If a party fails to provide information ... as required by Rule 26(a) or (e), the party is not allowed to use that information ... to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless.").